UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2006 APR -7 P 1: 34

U.S. DISTRICT COURT
DISTRICT OF MASS.

THE UNITED STATES OF AMERICA, and

THE STATES OF CALIFORNIA, DELAWARE,
FLORIDA, HAWAII, ILLINOIS, INDIANA,
LOUISIANA, MICHIGAN, NEVADA,  NEW
HAMPSHIRE, NEW MEXICO, TENNESSEE,
TEXAS, and

THE COMMONWEALTHS OF
MASSACHUSETTS and VIRGINIA, and

THE DISTRICT OF COLUMBIA,

ex rel. DANIEL W. ABSHEAR,

   Plaintiffs,

v.

NOVARTIS AG, and NOVARTIS
PHARMACEUTICALS CORPORATION,

   Defendants.

CIVIL ACTION NO.

*FILED IN CAMERA
and  UNDER SEAL*

**06 - 10620 NG**

## COMPLAINT

### INTRODUCTORY STATEMENT

   This is an action brought on behalf of the United States of America by Plaintiff DANIEL

W. ABSHEAR (hereinafter referred to as "Relator") against Novartis, AG,  and its subsidiary

Novartis Pharmaceuticals Corporation (collectively referred to as "Novartis" or "the

Defendants") pursuant to the *Qui Tam* provisions of the Federal Civil False Claims Act, 31

U.S.C. §§ 3729-33 ("Federal FCA" or "FCA"), and on behalf of the above named States under

their respective State False Claims Acts ("State FCAs") (together referred to herein as "*Qui Tam*

Action").  Pursuant to 31 U.S.C. § 3730 (b)(2), and comparable provisions in State FCAs, this

action is brought in camera and under seal.

The Relator in this case is an employee of Novartis Pharmaceuticals. The allegations of this Complaint arise from his first-hand knowledge, as a sales consultant, of the practices of the Defendants. The Defendants in this case have violated the Federal and State FCAs, the Medicare and Medicaid Anti-Kickback Act, and the Federal Food, Drug, and Cosmetic Act by engaging in numerous unlawful activities in their marketing of the drugs Diovan (Valsartan), Diovan HCT (a fixed-dose combination therapy of Valsartan with Hydrochlorothiazide) and Lotrel (a fixed-dose combination therapy of Amlodipine Besylate with Benazepril HCl). The Defendants' unlawful activities include, without limitation: (1) offering and paying kickbacks to physicians; (2) "off-label" marketing of Diovan, Diovan HCT and Lotrel for unapproved indications; and (3) misbranding of Lotrel in the use of misleading promotional material. Diovan, Diovan HCT and Lotrel are indicated for the treatment of hypertension, which is the most common primary diagnosis in America and affects more than fifty million people across the nation. Diovan is the nation's leading medicine in the treatment of hypertension with worldwide sales of $3.7 billion in 2005. Lotrel is the nation's leading combination therapy for the treatment of hypertension with sales of $1.1 billion in 2005 in the United States alone. Defendants' actions and omissions have caused physicians around the United States to improperly prescribe and administer Diovan and/or Diovan HCT and/or Lotrel thereby causing improper and illegal billings to the state and federal governments. These practices are detailed in the pages below and in Relator's Disclosure Statement served on the state and federal plaintiffs in this matter.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action under the Federal FCA pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730, and has supplemental jurisdiction over the State FCA claims pursuant to 28 U.S.C. §1367.

2.      Venue is appropriate as to the Defendants in that the Defendants transact business in this judicial district, and acts proscribed by 31 U.S.C. § 3729 have been committed by the Defendants in this judicial district. Therefore, within the meaning of 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a), venue is proper.

3.      To Relator's knowledge, jurisdiction over this action is not barred by 31 U.S.C. § 3730(e): there is no civil suit or administrative proceeding involving the allegations and transactions herein to which the United States is a party; there has been no "public disclosure" of these allegations or transactions; and Relator is the "original source" of the information upon which these allegations are based.

## THE PARTIES

4.      Relator Daniel w. Abshear is a citizen of the United States of America. He is a resident of Wentzville, Missouri, and a current employee of Novartis. The Relator brings this *Qui Tam* action based upon direct and unique information obtained during the period of his employment as a pharmaceutical sales consultant. Relator is providing a "disclosure statement" to the United States and to the Plaintiff States, as required by law.

5.      Defendant Novartis AG is a publicly-traded diversified, global pharmaceutical company with operations throughout the United States and in many other countries. Its principal place of business is Basel, Switzerland. Novartis is traded on the New York Stock Exchange under the symbol "NVS." Novartis AG operates in the United States through numerous subsidiaries including Defendant Novartis Pharmaceuticals Corporation headquartered in East Hanover, New Jersey. Novartis develops and markets pharmaceuticals in numerous therapeutic areas, including cardiovascular and metabolism, neuroscience, respiratory and dermatology, specialty medicines, oncology and hematology, transplantation and immunology, and ophthalmic diseases, as well as arthritis, bone, gastrointestinal, hormone replacement therapy, and infectious

- 3 -

diseases. The drugs at issue in this case, Diovan, Diovan HCT and Lotrel, are manufactured and marketed by Novartis. These three drugs are approved by the United States Food and Drug Administration for the treatment of hypertension. Diovan is indicated for hypertension, heart failure and for treatment of patients in post myocardial infarction; Diovan HCT and Lotrel are both indicated for hypertensive patients who do not respond well to a single drug regimen. Novartis conducts business in the Commonwealth of Massachusetts and every state within the United States.

## FEDERAL AND STATE LAWS

### Government Health Insurance Programs

6.      The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue. The program is overseen by the United States Department of Health and Human Services. Medicare was designed to be a health insurance program and to provide for the payment of hospital services, medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify under the terms and conditions of the Medicare Program. Payments made under the Medicare Program include payment for certain prescription drugs used during treatment at an appropriate medical facility and otherwise. Pursuant to the Medicare Prescription Drug Improvement and Modernization Act of 2003, effective January 1, 2006, Medicare Part D took effect, extending prescription drug coverage to all Medicare eligible persons who choose to participate in Part D.

7.      The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§1396-1396v (hereafter "Medicaid"), is a Health Insurance Program administered by the Government of the United States and the various individual States and is funded by State and Federal taxpayer

- 4 -

revenue. The Medicaid Program is overseen by the United States Department of Health and Human Services. Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.

8.      The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") (now known as "TRICARE"), 10 U.S.C. §§ 1071-1106, provides benefits for health care services furnished by civilian providers, physicians, and suppliers to members of the Uniformed Services and to spouses and children of active duty, retired and deceased members. The program is TRICARE pays for, among other items and services, prescription drugs for its beneficiaries.

9.      The federal government, through its Departments of Defense and Veterans Affairs, maintains and operates medical facilities including hospitals, and receives and uses federal funds to purchase prescription drugs for patients treated at such facilities and otherwise. In addition, under the Public Health Service Act, the Section 340B Drug Pricing Program, and the Veterans Health Care Act of 1992, the federal government directly or indirectly provides funds to certain other federal agencies and to state and local facilities and programs, including to non profit disproportionate share hospitals ("DSH"). *See generally* 38 U.S.C. § 8126.

10.     The Federal Employees Health Benefits Program ("FEHBP") provides health care benefits for qualified federal employees and their dependents. It pays for, among other items and services, prescription drugs for its beneficiaries. (Together these programs described in paragraphs 6 - 10 shall be referred to as "Federal Health Care Programs" or "Government Health Care Programs").

## The Federal Food, Drug and Cosmetic Act

11.     The Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. §§ 301, *et seq.*, prohibits the distribution of new pharmaceutical drugs in interstate commerce unless the Food and Drug Administration ("FDA") has determined that the drug is safe and effective for its intended use. 21 U.S.C. § 355 (a) and (d). An approved drug may be prescribed by doctors for uses other than those approved by the FDA, but manufacturers are prohibited from marketing or promoting the drug for such unapproved, new or "off label" uses. 21 U.S.C. § 331(d). If the manufacturer intends to promote the drug for such a new unapproved use, the manufacturer must file an application for the proposed new use with the FDA (or obtain an exemption therefrom) and any promotional materials concerning unapproved uses must meet strict statutory and regulatory requirements. *See* 21 U.S.C. §§ 360aaa, *et seq*.

12.     Whether a drug is FDA-approved for a particular use determines whether a prescription of the drug is reimbursed under many, if not all, Government Health Insurance Programs. For example, reimbursement under Medicaid is, in most circumstances, available only for "covered outpatient drugs." 42 U.S.C. §1396b(i)(10). Covered outpatient drugs do not include drugs that are "used for a medical indication which is not a medically accepted indication." *Id.* §1396r-8(k)(3). A medically accepted indication includes a use "which is approved under the Federal Food Drug and Cosmetic Act" or which is included in a specified drug compendia. *Id.* §1396r-8(k)(6). Thus, unless a particular off-label use for a drug is included in one of the identified drug compendia, a prescription for the off-label use of that drug is not eligible for reimbursement under Medicaid. There is a single exception: in certain circumstances Medicaid will reimburse the prescription of certain single-source or multi-source innovator drugs for an "off label" use where the individual State has determined, *inter alia*, that the drug is essential to the health of beneficiaries. 42 U.S.C. §1396r8(a)(3).

- 6 -

13.   The FFDCA provides criminal penalties for the dissemination of written

information to health care providers regarding the safety, effectiveness, or benefit of the use of a

drug that is not described in the FDA approved labeling of the drug, (i.e. a new use) if that

written information fails to conform to the law's requirements. 21 U.S.C. §§ 331(z), 333(a)(1)-

(2), 360aaa. A manufacturer may disseminate information on a new use of a drug only if it

meets the specific requirements set forth in 21 U.S.C. § 360aaa(b) which include:

(1)(A) in the case of a drug, there is in effect for the drug an application filed under
subsection (b) or (j) or section 355 of this title or a biologics license issued under section
262 of Title 42...

(2) the information meets the requirements of section 360aaa-1 of this title;

(3) the information to be disseminated is not derived from clinical research conducted by
another manufacturer or if it were derived from research conducted by another
manufacturer, the manufacturer disseminating the information has the permission of such
other manufacturer to make the dissemination;

(4) the manufacturer has, 60 days before such dissemination, submitted to the Secretary-
(A) a copy of the information to be disseminated; and
(B) any clinical trial information the manufacturer has relating to the safety or
effectiveness of the new use, any reports of clinical experience pertinent to the safety of
the new use, and a summary of such information;

(5) the manufacturer has complied with the requirements of section 360aaa-3 of this title
(relating to a supplemental application for such use);

(6) the manufacturer includes along with the information to be disseminated under this
subsection –
(A) a prominently displayed statement that discloses –
(i) that the information concerns a use of a drug or device that has not been approved or
cleared by the Food and Drug Administration;
(ii) if applicable, that the information is being disseminated at the expense of the
manufacturer;
(iii) if applicable, the name of any authors of the information who are employees of,
consultants to, or have received compensation from, the manufacturer, or who have a
significant financial interest in the manufacturer;
(iv) the official labeling for the drug or device and all updates with respect to the
labeling;
(v) if applicable, a statement that there are products or treatments that have been
approved or cleared for the use that is the subject of the information being disseminated
pursuant to subsection (a)(1) of this section; and
(vi) the identification of any person that has provided funding for the conduct of a study

- 7 -

relating to the new use of a drug or devise for which such information is being
disseminated; and

(B) a bibliography of other articles from a scientific reference publication or scientific or
medical journal that have been previously published about the use of the drug or device
covered by the information disseminated (unless the information already includes such
bibliography).

Furthermore, 21 U.S.C. § 360aaa-1 (referenced in § 360aaa(2) above) states in part:

(a) Authorized information – A manufacturer may disseminate information under section
360aaa of this title on a new use only if the information –

(1) is in the form of an unabridged –

(A) reprint or copy of an article, peer-reviewed by experts qualified by scientific training
or experience to evaluate the safety or effectiveness of the drug or device involved, which
were published in a scientific or medical journal (as defined in section 360aaa-5(5) of this
title), which is about a clinical investigation with respect to the drug or device, and which
would be considered to be scientifically sound by such experts; or
(B) reference publication, described in subsection (b) of this section that includes
information about a clinical investigation with respect to the drug or device that would be
considered to be scientifically sound by experts qualified by scientific training or
experience to evaluate the safety or effectiveness of the drug or device that is the subject
of such a clinical investigation; and

(2) is not false or misleading and would not pose a significant risk to public health.

14.    In addition, the FFDCA prohibits the misbranding of a drug or device, such as the

ones in this case. A drug is deemed to be misbranded if its labeling is false or misleading in any

particular. 21 U.S.C. §352 (a). "Labeling" is defined to include brochures, booklets, mailing

pieces, detailing pieces as well as literature and reprints. (*See* 21 U.S.C. § 321(k) and (m) and 21

C.F.R. § 202.1(l)(2)).

## The Federal and State False Claims Acts

15.    The Federal FCA, 31 U.S.C. § 3729(a)(1), makes "knowingly" presenting or

causing to be presented to the United States any false or fraudulent claim for payment, a

violation of federal law for which the United States may recover three times the amount of the

damages the government sustains and a civil monetary penalty of between $5,000 and $10,000

per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

- 8 -

16.     The Federal FCA, 31 U.S.C. § 3729(a)(2), makes "knowingly" making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

17.     The Federal FCA, 31 U.S.C. § 3729(a)(3), makes any person, who conspires to defraud the United States by getting a false or fraudulent claim allowed or paid, liable for three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

18.     The Federal FCA, 31 U.S.C. § 3729(a)(7), makes it illegal for any person to "knowingly" make, use or cause to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government, a violation of federal law for which the United States may recover three times the amount of the damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

19.     The Federal FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

20.     As set forth below, several states have passed False Claims Act legislation, which in most instances closely tracks the Federal FCA: California False Claims Act, Cal. Gov't Code

- 9 -

§ 12650 *et seq.*, Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, §§ 1201 *et seq.*, District of Columbia Procurement Reform Amendment Act, D.C. Code §§ 2-308.13 *et seq.*, Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*, Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*, Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*, Indiana False Claims and Whistleblower Protection Act, IC 5-11-5.5, Louisiana Medical Assistance Programs Integrity Law, 46 La. Rev. Stat. c. 3, § 437.1 *et seq.*, Massachusetts False Claims Act, Mass. Gen. Laws Ch. 12, §§ 5A *et seq.*, Michigan Medicaid False Claims Act, MI ST Ch. 400, Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq,,* New Hampshire False Claims Act, N.H. RSA §§ 167:61-b, *et seq.*, New Mexico Medicaid False Claims Act, 2004 New Mexico Laws Ch. 49 (H.B. 468), Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*, Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code §§ 36.001 *et seq.*, and Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.* These State False Claims Acts apply, *inter alia,* to the state portion of Medicaid fraud losses caused by false Medicaid claims to the jointly federal-state funded Medicaid program. Each of the statutes listed above contains *qui tam* provisions governing, *inter alia*, a relator's right to claim a share of the State's recovery.

## The Medicare and Medicaid Anti-Kickback Act

21.     The Medicare and Medicaid Anti-Kickback Act ("AKA"), 42 U.S.C. § 1320a-7b (b), makes it illegal to offer, receive, or solicit any remuneration, kickback, bribe, or rebate, whether directly or indirectly, overtly or covertly, in cash or in kind, to or from any person in order to induce such person to purchase, lease, or order, or to arrange for or recommend the purchasing, leasing, or ordering of any good, service, or item for which payment may be made in whole or in part under a Government Health Care Program. The AKA seeks to prohibit such activities in order to secure proper medical treatment and referrals, and to limit the possibility of

a patient having to undergo unnecessary treatments or having to accept specific items or services which are based not on the needs of the patient, but on the incentives given to others, thereby limiting the patient's right to choose proper medical care and services.

## FACTS AND ALLEGATIONS

### Relator Daniel Abshear

22.     Relator, Daniel W. Abshear lives in Wentzville, Missouri. He has over nine years of experience working in the pharmaceutical industry, the last four yeas of which have been with the Defendants. He began his career in the health care industry when, after six years of service in the United States Navy as a hospital corpsman, he joined Tenet Healthcare as an account manager. While working full-time at Tenet, he also undertook and completed a college education, graduating with a Bachelor of Arts degree from Columbia College, Missouri. In 1996 Mr. Abshear joined Merck Pharmaceuticals as a representative in the Columbia, Missouri area. During his three years with Merck, Mr. Abshear was ranked in the top ten percent of regional sales representatives for his sales of Cozaar, a hypertension medication. From 1999 to 2001, Mr. Abshear worked for Pharmacia Corporation in St. Louis, Missouri where as an institutional sales representative he was ranked best salesman in six states for the drug Zyvox, an antibiotic. In 2001, Relator moved to Novartis as a sales consultant based in St. Louis. Since joining Novartis Mr. Abshear's hard work and dedication have earned him company awards for outstanding sales performance including, "Player of the Trimester" (2002); and the "Arch" award (2003). In 2004 Mr. Abshear was designated "quarterback" for his team of seven co-workers in recognition of his teamwork and leadership skills. His performance reviews have been consistently "superior" and he has been awarded above-average salary increases and, uniquely for a Novartis sales consultant awarded stock options.

23. Novartis, whose group turnover in 2005 was \$32.2 billion, is split into three divisions: Pharmaceuticals (prescription drugs); Sandoz (generic drugs); and Consumer Health (over-the-counter medicines; nutrition and vision). The Pharmaceutical division accounted for 63% of group turnover in 2005 and comprises: Primary Care; Oncology; Transplantation and Immunology; Ophthalmics; and Mature products. Relator works in the Primary Care division of Novartis Pharmaceuticals. Relator and his seven "teammates" are jointly responsible for the target group of approximately 170 doctors.

## Diovan and its approved uses

24. Diovan is indicated and approved for the treatment of three medical conditions: hypertension, heart failure and for treatment of patients in post myocardial infarction. It is the number one prescribed brand in its class of angiotensin receptor blockers ("ARB"s) representing 38% of the market and in 2005 generated a turnover of \$3.7 billion for Novartis, up 19% worldwide from 2004. Diovan is the company's flagship product and was first approved in 1997 for the treatment of hypertension. In 2002, the FDA approved a new application of the drug for the treatment of heart failure in patients who are intolerant to an ACE (angiotensin converting enzyme) inhibitor. In 2005, the FDA granted further approval of Diovan for the treatment of patients in post myocardial infarction.

## The Defendants' Detailing of Physicians Concerning Diovan's Unapproved Uses

25. In or around 2002 Novartis disseminated to its sales forces copies of a study "Valsartan [Diovan] Benefits Left Ventricular Structure and Function in Heart Failure: Val-HeFT Echocardiographic Study" by Maylene Wong et al., *Journal of American Cardiology*, September 4, 2002, Vol 40. No. 5 (the "Wong" study). The sales consultants were encouraged to use the Wong study to endorse a theory that Diovan, when taken with an angiotensin-converting enzyme inhibitor ("ACE inhibitor") or beta-blocker, caused a beneficial reduction in the

- 12 -

diameter of the left ventricle or a positive phenomenon known as increased "ejection fraction."
The ejection fraction measures the extent to which the heart can "eject" its volume of blood, i.e.
a measure of how little is left behind after a beat. Both applications are "off-label" for Diovan.
The study, which was funded by Novartis, gave no indication that Diovan is not approved for
either remodeling regression or increasing ejection fraction.

26.     Novartis produced and distributed a "glossy" pamphlet based upon these
beneficial side effects and, along with the Wong study, distributed copies nationwide to its sales
force. Later in or around 2003, Relator recalls that Novartis issued a "destruction notice"
requiring all representatives to withdraw these materials from circulation. On information and
belief this destruction notice originated from Novartis headquarters in East Hanover, New Jersey.
However, in 2005 Novartis reissued both pieces on a nationwide basis with no reference to the
earlier destruction notice, recommencing this particular off-label promotion. Novartis
specifically told representatives not to distribute copies of the Wong study when promoting the
drug to doctors. However, each sales consultant was also sent dozens of copies leading them to
conclude that, while the company was legally required to eschew off-label marketing, it fully
expected its representatives to ignore the "warnings" and talk to the doctors about the off-label
benefits of Diovan and leave copies of the study with them.

## The Defendants' Detailing of Physicians Concerning Diovan HCT's Unapproved Uses

27.     Diovan HCT is a fixed dose combination therapy indicated for the treatment of
hypertension. The drug is specifically "not indicated for initial therapy." As the Diovan HCT
label information explains, this is to minimize side effects more likely to occur with a dual
therapy. The drug is indicated for hypertension only if a patient has failed to achieve medically
appropriate results with a single drug. Nevertheless, Defendants supplied their sale force with
copies of the 1998 study "Valsartan and hydrochlorothiazide in patients with essential

- 13 -

hypertension. A multiple dose, double-blind, placebo controlled trial comparing combination therapy with monotherapy" JR Benz *et al*. Journal of Human Hypertension (1998) 12, 861 – 866, a study sponsored by Novartis. This study found that the combination therapy was more effective in controlling blood pressure than the other monotherapies used in the trial, including the monotherapy Diovan. It may appear that Novartis is competing against itself in pitting Diovan HCT against Diovan (the number one ARB). In fact Diovan is number one only in its class, Norvasc is the best selling antihypertensive drug with sales of $2.6 billion in the United States alone in 2005. As Diovan HCT is specifically not indicated as an initial treatment for hypertension, this promotion contradicts the drug's approved use and constitutes off-label marketing.

**Lotrel and its approved use**

28.    Lotrel, (a combination of Norvasc (Amlodopine) and Lotensin (Benazepril Hydrochloride)) is indicated where the patient has failed to achieve desired results with a single drug or who has developed edema in the course of single drug therapy. It is the combination of Lotensin with Norvasc which reduces the incidence of edema. Lotrel is specifically "not indicated for the initial therapy of hypertension." The drug was first approved in 1991. Today it is the most popular fixed combination antihypertensive medicine and enjoyed growth of 17% in 2004 achieving sales of $1.1 billion.

**The Defendants' Detailing of Physicians Concerning Lotrel's Unapproved Uses**

29.    Lotrel is approved for the treatment of hypertension, but like, Diovan HCT, it is specifically "not indicated for initial therapy." As the Lotrel label information explains, the drug is indicated only if the patient has failed to achieve medically appropriate results on a single drug, or has developed peripheral edema which may be treated more effectively with a combination therapy. Nevertheless, Defendants supplied their sales force with copies of the 1996

study "Treatment of patients with essential hypertension: Amlodopine 5mg/Benazepril 20 mg compared with Amlodopine 5mg, Benazepril 20 mg, and placebo." Emilio Kuschnir, M.D. *et al*. Clinical Therapeutics, Vol. 18, No. 6 1996, a study funded by a grant from Ciba-Geigy Corporation (Ciba-Geigy and Sandoz joined to become Novartis in 1996). This study found that the combination therapy was more effective in controlling blood pressure than the other monotherapies used in the trial. As Lotrel is specifically not indicated as an initial treatment for hypertension, this promotion contradicts the drug's approved use and constitutes off-label marketing.

## The Misbranding of Lotrel

30. In September 2005, the medical journal *The Lancet* published the results of a seven year study known as the ASCOT trial. ("Prevention of cardiovascular events with antihypertensive regimen of Amlodopine adding perindopril as required versus Atenolol adding bendroflumethiazide as required, in the Anglo-Scandinavian Cardiac Outcomes Trial-Blood Pressure Lowering Arm (ASCOT-BPLA): a multicenter randomized controlled trial" *The Lancet*, September 10, 2005, Volume 366.) This study compared the performance of the combinations of Norvasc (Pfizer) with Aceon (Solvay Pharmaceuticals) versus Tenormin (an Astra-Zeneca) with Bendroflumethiazide (a diuretic). The study summary concluded that "The Amlodopine-based (Pfizer) regimen prevented more major cardiovascular events and induced less diabetes than the Atenolol-based regimen" *Id.* This finding was obviously of great moment for Norvasc (Pfizer).

31. Less obvious was the benefit to Novartis. Using the ASCOT study as their scientific foundation, Novartis produced two glossy pamphlets promoting Lotrel on the basis of the ASCOT study. Although neither Lotrel nor Lotensin played any part in the trial, the promotional material ("discussion only, not to be left behind") did not highlight this fact.

Novartis specifically told representatives not to distribute copies of the ASCOT material when promoting the drugs to doctors. But Relator and, on information and belief, other Novartis sales consultants were sent dozens of copies. This misleading promotion of Lotrel on the back of the ASCOT study constitutes misbranding of the drug pursuant to 21 U.S.C. §352 (a).

## Kickbacks – offer and payments in cash and in kind to influence prescribers

32.     In 2005 Novartis began "donating" flat screen TV's to medical practitioners with the understanding and expectation that Novartis' "investment" would be used by the sales force to change their prescribing practices and switch patients to Novartis' drugs, Diovan and Lotrel. Approximately *ten thousand* doctors across the United States, generalists and cardiologists, received a flat screen television monitor installed in their offices free of charge. The system was designed to play a twenty five minute silent advertising "loop" for Novartis products. Novartis calculated that this extensive network provided access to *sixty million patients*. The screen displayed only Novartis approved content via its partner, the "Health Advice Network." Recipient doctors were assured, by reference to Novartis promotional material, that 90% of patients believed that having a flat screen TV in the waiting room meant that their doctor was "progressive." (*See* Novartis promotional piece "Novartis CV franchise has a presence in primary care and cardiologist offices.")

33.     Employing a similar strategy, Novartis also gave thousands of doctors DVD players which could only display Novartis promotional material. This audio-visual system, known as the "Novartis Physician Patient Network" (or "NPPN"), was donated to approximately four thousand five hundred physicians and, according to an email of February 21, 2006 sent by Ted Raad, Chicago Regional Director, had *quantifiable* effect on the number of prescriptions written for Diovan and Lotrel: doctors in the NPPN "club" (91% of whom nationwide received the NPPN DVD player) wrote between 16% and 28% more prescriptions for Diovan or Lotrel

than those who had not received the DVD player. This correlation between "investment" and "return on investment" was not coincidental Novartis expected their "national give-away" to result in increased prescribing.

34.    In addition to the national campaign to distribute TVs and DVD players, Novartis uses a host of other incentives for doctors, including, without limitation: budgets for clinical trials; preceptorship payments in the sum of $500 for which many sale representatives spend just fifteen minutes with their doctor; and "PILS" (Patient Information Learning System) events, where a doctor is paid to talk to other doctors in his office about a Novartis product over a meal provided by Novartis.  Novartis stratifies target doctors according to how many Novartis prescriptions they write (tiers one through five, five being the lowest).  Sales consultants are directed how to spend their speaker budgets ($2200 per event) for example "Every representative has TOP 20 physicians identified.  In BLUE districts above, these TOP 20 should primarily be Medicaid writers" (Email from District Manager Nancy Smith to Relator's team of January 14, 2005).

35.    In its February 2006 circular, Novartis advised their sales representatives that the free flat screen television running the "Healthy Advice Network" "*provides a unique opportunity to increase brand awareness.*"  The brochure emphasized the commercial advantages of the campaign *"Ad placement within these offices was determined based upon physician prescribing habits (top tier physicians for each brand), as well as BPSZ* [Blood Pressure Success Zone] *redemptions and in-services. A highly complex and sophisticated methodology was applied to ensure that the targeted physicians offices display the most appropriate message by which they would be most likely to respond with a prescription for one of our brands" Id.*  Novartis explicitly instructed its sales representatives to "*go ahead and take credit*" and "*leverage this service with office staff.*"  *Id.*  Richard Smith, Director of NPPN, sent a DVD message to the

Novartis sales consultants instructing them that "*Now it is time for you to ask for something in return.*" On information and belief, this message was sent out nationwide.

36.     The sales representatives got the message, as illustrated by the notes written by Relator's partner Dave Aschemann. Mr. Aschemann is a fifteen year pharmaceutical sales veteran and enjoys the status of "executive sales consultant," the highest level of sales consultant in the Novartis primary care division. Novartis has educated Aschemann and others like him to exploit promotional campaigns in an unlawful way to "leverage" the benefit to doctors and to use that leverage to "weaken" and "clamp down on" doctors. (*See* Aschemann Progress Notes for Dr. Kevin Oliver November 17, 2005, discussed below)

37.     Novartis requires its representatives to maintain "progress" or "call notes", detailing their sales efforts with doctors. These notes are maintained on a Novartis server and are open access documents, so a sales representative can monitor others' methods and learn the Novartis sales culture. The system is also designed to enable district and regional managers to monitor unlawful activity. The system also allows Mr. Aschemann's teammates to track progress with individual doctors and pick up where others have left off. In Aschemann's progress notes he details both the "investment" Novartis has made in his doctors as well as progress in "leveraging" that investment to realize sales (or "return on investment"):

*   **Dr. Peter Montgomery** of Wentzville, Missouri has received Novartis money for his involvement in Diovan and Lotrel trials. Aschemann remarks in notes of his conversations with Dr. Montgomery "*We provide income for him via trials*" (April 19, 2005) and "*He needs to be reminded of all investment we have placed in him for our studies w/dio* [Diovan] *and ltl* [Lotrel]. *We need ROI* [Return on investment]" (July 26, 2005)

- 18 -

- **Dr. Jeffrey Boesch** of Chesterfield, Missouri, has also received many payments from Novartis for speaking engagements as well as an NPPN DVD system. In his progress notes of meetings with Boesch, Aschemann notes that: "*He is speaker for both LTL (Lotrel) and DIO (Diovan) so we need ROI on the investment.*" (August 25, 2005)

- In July of 2005, Aschemann noted that **Dr. Mera** who practices with **Dr. Boesch** and a, Dr. Kumar, in Chesterfield, Missouri "*had a great time at dinner and said they missed me there. Told ab incident. Had Dr. sign agreement and he was happy. He was excited to tell me that they put LTL (Lotrel) on the "formulary". I said great news and mentioned having LTL on and Benicar off is great news.*" Six weeks later the Dr. Mera was "*very happy to receive Neters* [Netters medical textbook] *and excited to receive and would like case. Will help us out.*" (September 20, 2005). The following month Aschemann notes that the same doctor "*loved bookcase and very happy. Gets our message and will use more of both.*" (October 3, 2005) Four months later the doctor reports that he "*had a great time w/Kate and wanted to set up time for use to come for speaking engagement. Said no worries w/BEN* [Benicar, the fast growing competitor drug manufactured by Daichii Sankyo Inc.] *and he said needed LTL (Lotrel) 5/20 mg and is using more.*" (February 8th, 2006)

- The money which Novartis will pay a doctor to conduct clinical trials is used both as a carrot and a stick. Aschemann notes in his conversation with **Dr. Cuellar** of Wentzville, Missouri that he "*Need[s] his support now to be considered part of future trials*" (September 26, 2005); Aschemann also made a note to "*remind him he is involved in Px* [patient] *trials these will dry up for him unless we see ROI !!!!!*" (August 23, 2005)

- **Dr. David Easterday** of Troy, Missouri, also a recipient of the NPPN DVD system, is reminded of "*his helpo* [sic] *needed in support of NPPN program; neeeded* [sic] *LTL*

*(Lotrel) 10/20 mg*." Dr. Easterday apparently responded positively to this pressure as the representative notes that Dr. Easterday "*got the message and will use more of both*." (October 3, 2005) Three weeks later Aschemann again reminds the doctor of "*all we do for him w/NPPN and sample bins. Need to get on board again ROI !!!!!!!!*" (October 24, 2005)

- **Dr. Ketchum** of Chesterfield, Missouri was warned that "*If involved intrils* [in trials] *should be using Dio* [Diovan] *as main ARB*" (August 8th, 2005) and after being consistently reminded of this message the doctor "*Just wrote Dio* [Diovan] *for PX for 1 yr. Wanted to make me happy*." (September 28, 2005)

- **Dr. Kevin Oliver** of Warrenton, Missouri is "*considered a major part of our business and we have helped him w/ his practice by sample bins, PX* [patient] *brochures and now NPPN program. We have stepped up to the plate to help his PX and now we would certainly appreciate his help in our products*" (July 6, 2005)   Again in September the doctor is reminded of "*all what we have done for him w/ NPPN, sample bins etc. plus sell LTL* [Lotrel] *avoid steps. Medicaid reminder as well*." (September 21, 2005)   After several more such reminders the doctor promises "*will try to do better on both DIO* [Diovan] *and LTL* [Lotrel]" (January 10, 2006)

38.     For his effectiveness in "moving the business forward," Novartis awarded Aschemann the inaugural "Closing For Money" award in August 2005.  The award, announced by email on September 11, 2005, held Aschemann up to his colleagues as an example of the successful sales representative. Meanwhile, the Ciba/Novartis (a sales group within Primary Care) received a letter from Jay S. Smith, Vice President of Sales for the Ciba/Novartis group, congratulating the sales consultants for realizing "*immediate ROI*" through "*Excellent leverage of samples, medical education, and promotional programs*."  Approximately one thousand

- 20 -